UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                                                              Case No:  2:12-cr-114-FtM-99SPC

DANIEL CHARLES KIRK
_____/

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on Defendant Daniel Charles Kirk's Motion to Suppress Statements (Doc. #24) filed on January 17, 2013. The Government's Response to Defendant's Motion to Suppress (Doc. #26) was filed on January 31, 2013. A hearing was held before the undersigned United States Magistrate Judge on February 26, 2013. The Defendant was present and represented by Assistant Federal Public Defender Russell Rosenthal. The Government was represented by Assistant United States Attorney David G. Lazarus.

At the hearing, the Government called three witnesses: Deputy Ronald Chandler, III, Deputy Sean Franko, and Deputy David Cox, of the Charlotte County Sheriff's Office. The Government also introduced four exhibits: CD containing Audio Statement and Transcript (Gov't. Ex. 1), Transcript of Audio Statement (Gov't. Ex. 1a), Eleven Photographs of the Defendant (Gov't. Ex. 2a-2k), and CCSO Interview/Recorded Statement Guide (Gov't. Ex. 3). The Defendant called Megan Cox as his only witness. The Defendant introduced six exhibits: Map of Incident Scene and Surrounding Areas (Def. Ex. A), and Photographs of Defendant (Def. Ex. B1, B2, B3, B4, B5).

## TESTIMONY AND EVIDENCE

**Deputy Sean Franko: (Tr. 5-58).**

Deputy Sean Franko ("Deputy Franko") is employed with the Charlotte County Sheriff's Office in the K-9 Unit where he has served for approximately eight years. (Tr. 5:17-25). Deputy Franko testified that he has approximately 18 years' experience in law enforcement and has training in the recognition of drivers who are impaired or intoxicated. (Tr. 5:24-25, 6:1). On or about February 1, 2012, Deputy Franko was with the K-9 unit on patrol in a marked patrol car. (Tr. 9:9-15). Deputy Franko participated in the arrest of Defendant Kirk. (Tr. 9:2-9).

On or about 2:00 a.m. Deputy Franko heard a radio report from Sergeant Hertenlehner that there was a subject in the parking lot of Alli-Gators Florida Grill & Bar ("Alli-Gators") with a shotgun. (Tr. 9:11-23). Deputy Franko testified that as he pulled into the Port Charlotte Town Center, where Alli-Gators is located, he saw the taillights of a vehicle that appeared to be a truck or SUV, traveling at a high rate of speed, being followed by Sergeant Hertenlehner's patrol car. (Tr. 10:13-25). He began to follow behind the patrol car and could see the taillights of the vehicle in front of the patrol car. (Tr. 11:3-12). Deputy Franko stated that the vehicle made several sharp turns at a high rate of speed but he never saw the vehicle run off the road or its tires leave the pavement. (Tr. 12:1-25, 13:1-25, 14:1-19). Because of his distance behind the two vehicles, Deputy Franko did not witness every turn made by the vehicles in front of him but the tire marks on the road where turns were made, suggest that the tires never left the pavement. (Tr. 12:13-21). Deputy Franko stated that the only time the suspect's vehicle left his lane of traffic was to make a turn. (Tr. 14:4-11). Deputy Franko testified that he was impressed with the

Defendant's driving and how well he was able to maintain control of the vehicle during the pursuit. (Tr. 26:4-22).

According to Deputy Franko, the suspect's vehicle stopped at Edgewater and Bayshore. (Tr. 14:20-23). When Deputy Franko first arrived at the scene, there were two other deputies, Deputy Scott and Deputy Cox, already on scene with their guns out, giving commands to the driver. (Tr. 14:24-25, 15:1-17). The suspect did not comply with Deputy Scott's orders although he did exit the vehicle. (Tr. 15:14-25, 16:1). Deputy Franko identified Defendant Kirk as the driver of the vehicle. (Tr. 9:2-9). After stepping out of the vehicle the Defendant reached back into the vehicle and appeared to be pulling out something small and black following which he reached into his waistband. (Tr. 15:14-24).

Because the Defendant was not complying with the commands given by Deputy Scott, and he was still possibly armed, Deputy Franko feared the Defendant was reaching for a gun. (Tr. 15:25, 16:1-8). Deputy Franko made the determination to release his K-9 partner to stop the threat. (Tr. 16:1-8). Deputy Franko's K-9 partner, Azor, apprehended the Defendant by biting his lower calf and forearm following which Deputy Franko tackled the suspect. (Tr. 16:1-3).

The Defendant was transported to Fawcett Memorial Hospital by EMS pursuant to the Charlotte County Sheriff's Office policy that if a K-9 makes any contact with the skin, the person has to be evaluated by a doctor. (Tr. 18:5-22). Deputy Franko went to the hospital pursuant to the K-9 unit policy that anytime there is a physical apprehension with a K-9, there must be photo documentation whether or not there are injuries. (Tr. 28:22-25, 29:1-11). Deputy Franko was at the hospital with the Defendant about thirty to thirty-five minutes. (Tr. 21:24-25, 22:1). Deputy Franko took photos of the Defendant's injuries to document them. (Tr. 22:22-25, 28:22-25). Deputy Franko testified that while at the hospital, the Defendant was awake, coherent,

aware, and compliant. (Tr. 23:4-25, 24:1-3, 31:1-12). Deputy Franko did not believe the Defendant was intoxicated while at the hospital. (Tr. 26:1-5).

On cross examination, Deputy Franko testified that he recalled the defendant crying at the hospital. (Tr. 47:11-20). Deputy Franko also stated that the Defendant's eyes were glassy and bloodshot. (Tr. 48:22-25, 49:1-3). Deputy Franko did not perform any sobriety tests on the Defendant, nor witness any being performed. (Tr. 49:23-25, 50:1-8).

**Deputy David Cox: (Tr. 59-91).**

Deputy David Cox ("Deputy Cox") is employed with the Charlotte County Sheriff's Office where he has served for approximately six and a half years, with a year and a half experience as a patrol deputy. (Tr. 59:17-25, 60:1-2). Deputy Cox has training in the recognition of drivers who are impaired or intoxicated. (Tr. 61:5-15). On or about February 1, 2012, Deputy Cox was on patrol in uniform in a marked patrol car unit. (Tr. 61:16-20, 62:10-13). Deputy Cox had a civilian passenger with him that evening.[1] (Tr. 61:21-25, 62:1-9). Deputy Cox participated in the arrest of Defendant Kirk. (Tr. 62:14-25).

Deputy Cox testified that he first heard the radio alert to be on the lookout for a red Chevy pickup at approximately 2:17 a.m. and approximately thirty seconds later he observed the vehicle go through the intersection of Edgewater and Harbor Boulevard going approximately sixty (60) miles an hour. (Tr. 63:2-25, 64:1). Deputy Cox became the first vehicle behind the Defendant's vehicle. (Tr. 65:6-8). After employing the patrol car's emergency lights and sirens, Deputy Cox followed the Defendant for less than a mile before the Defendant pulled over and Deputy Cox was able to perform a traffic stop. (Tr. 65:12-16, 66:19-25, 67:1). Deputy Cox and Deputy Scott ordered the Defendant out of his vehicle and to keep his hands visible. (Tr. 66:1-6). Deputy Cox stated that the Defendant, although not compliant at first, did eventually step out of

---

[1] Deputy Cox testified that the civilian had no role in any of the events that occurred on that date. (Tr. 62:5-9).

his vehicle but appeared to be reaching into his waistband for something and it was then that Deputy Franko released his dog. (Tr. 68:9-25, 69:15-22).

After handcuffing the Defendant he was still physically resisting. (Tr. 70:8-15). Deputy Cox followed EMS to Fawcett Memorial Hospital and stayed while the Defendant received treatment for his wounds. (Tr. 70:21-25, 71:1-2). Deputy Cox did not speak to the Defendant but did hear him say "just take me to jail. I've had worse injuries than this before." (Tr. 71:11-25). Deputy Cox testified that the Defendant's demeanor at the hospital was normal. (Tr. 72:1-3). Although the Defendant had the smell of alcohol on his person, he was not stumbling, mumbling, stuttering or slurring his words but he did have a slight southern accent. (Tr. 72:4-8). The Defendant was released from the hospital approximately forty-five (45) minutes later. (Tr. 73:20-25, 74:1-2).

Deputy Cox transported the Defendant from the hospital to the Charlotte County Jail at about 3:35 a.m. in his official police marked unit. (Tr. 73:20-25, 74:1-2). The Defendant did not need any assistance to walk to the vehicle nor did he appear to be in an unbearable amount of pain. (Tr. 74:7-21). Deputy Cox testified that the Defendant was awake and quiet during the ride to the jail and seemed to be aware of his surroundings the whole time. (Tr. 75:10-25, 76:1-6). Deputy Cox stated that once arriving at the jail there was a routine transfer of custody and the Defendant was compliant. (Tr. 78:5-14).

On cross examination, Deputy Cox testified that the Defendant was extremely upset on the scene and was somewhat out of control. (Tr. 83:10-19). Once at the hospital, the Defendant was still quite upset and anxious. (Tr. 84:16-25). Deputy Cox did not know whether the Defendant received any pain medication while at the hospital. (Tr. 86:12-25, 87:1-5). However,

there was nothing that led Deputy Cox to believe that the Defendant was overcome by alcohol or pain medication so that he was unaware of his surroundings. (Tr. 91:2-6).

**Deputy Ronald Chandler III: (Tr. 92-138).**

Deputy Ronald Chandler, III ("Deputy Chandler") is employed with the Charlotte County Sheriff's Office where he has served for approximately nine years. (Tr. 92:15-21). He is currently assigned to the K-9 unit however in February of 2012 he was assigned as a road patrol deputy. (Tr. 92:22-25, 93:1-4). Deputy Chandler has experience in the recognition of drivers who are impaired and intoxicated. (Tr. 93:13-25, 94:1-9). On or about February 1, 2012, Deputy Cox was on patrol and participated in the pursuit and apprehension of Defendant Kirk. (Tr. 94:10-24, 95:1-7). Deputy Chandler was classified as the arresting officer in this case. (Tr. 114:21-23). Deputy Chandler charged the Defendant with use of a firearm by somebody under the influence of alcohol. (Tr. 115:2-9).

Once the Defendant was located by the other units, Deputy Chandler went to Alli-Gators to conduct an investigation. (Tr. 97:1-3). Deputy Chandler's involvement in the investigation at Alli-Gator's entailed finishing up witness statements that were already in progress. (Tr. 97:24-25, 98:1-12). Deputy Chandler returned to the Charlotte County Jail to make contact with Defendant Kirk and conduct an interview. (Tr. 98:13-25, 100:8-10). Deputy Chandler advised the Defendant of his <u>Miranda</u> rights and the Defendant indicated he understood them. (Tr. 101:18-25, 110:19-25). (Gov't. Ex. 3). Deputy Chandler's interaction with the Defendant lasted approximately ten (10) minutes. (Tr. 107:3-4). Deputy Chandler testified that he did not threaten, coerce or promise the Defendant anything to get him to speak. (Tr. 107:8-15). Deputy Chandler was in uniform but had no weapons with him during his interview with the Defendant. (Tr.

94:17-18, 101:12-17). Deputy Chandler did not speak with either Deputy Cox or Deputy Franko about any conversations they may have had with the Defendant. (Tr. 111:24-25, 112:1-3).

Deputy Chandler testified that during the interview the Defendant appeared normal, was able to speak clearly, appeared to have clear thoughts, and answered questions without hindrance. (Tr. 107:16-22). The Defendant's statement was made approximately two hours after the first radio call. (Tr. 116:17-20). Deputy Chandler believed the Defendant was sober at the time of the interview due to his ability to understand questions and answer them thoroughly, his clear and precise thought process, and his lack of slurred speech. (Tr. 111:16-23). Deputy Chandler stated the Defendant did not appear to be overcome by physical pain or pain medication during his interactions with him. (Tr. 114:2-10).

On cross examination, Deputy Chandler stated it was not an important aspect of his investigation to ascertain how many alcoholic drinks the Defendant had prior to the interview or whether the hospital had given the Defendant any pain medications. (Tr. 118:11-25, 119:1-13, 121:24-25, 123:23-25, 124:1-9). Deputy Chandler also testified that he did not inquire about the Defendant's mental health history, level of education, or intelligence because it would not have affected the way he conducted the interview. (Tr. 126:4-16, 129:7-25).

**Megan Cox: (Tr. 139-155).**

Megan Cox, ("Cox") testified that she was present at Alli-Gators on the night of Defendant Kirk's arrest. (Tr. 141:19-21). She has known the Defendant for a couple of years and has gone out drinking with him fairly regularly. (Tr. 140:6-23, 142:22-25, 143:1). Cox testified that the Defendant text messaged her around 10:00 p.m. that he was at Alli-Gators and she met him there at approximately 10:30 p.m. (Tr. 141:22-25, 142:1-21). Cox stated that when she arrived at Alli-Gators, she could tell the Defendant had been drinking. (Tr. 143:10-13). Cox was

7

there with Defendant, consuming alcohol until around 2:00 a.m. (Tr. 143:20-24). Cox witnessed Defendant Kirk drink six beers and three straight shots of alcohol during that time, although he could have drank more. (Tr. 143:25, 144:1-11). Cox stated the three shots were consumed sometime between 12:30 a.m. and 1:30 a.m. (Tr. 151:13-25).

Cox stated the Defendant was quite intoxicated around 2:00 a.m. and should not have been driving. (Tr. 144:12-19). Cox said that the Defendant was finishing up a beer at approximately 2:00 a.m. (Tr. 144:20-25). Cox testified that the Defendant got into an altercation with a bouncer at Alli-Gators and went to his truck and took out a shotgun. (Tr. 145:3-25, 146:1-9). Cox attributes the Defendant's conduct to him being intoxicated. (Tr. 145:18-23). On cross-examination, Cox testified that the Defendant was not slurring his words and could stand and walk on his own. (Tr. 149:15-25, 150:8-22). Cox also stated that the Defendant was not disoriented or confused about where he was. (Tr. 150:23-25, 151:1-5).

## DISCUSSION

The Defendant moves to suppress incriminating statements made during a post-Miranda interview conducted by Deputy Chandler in the early morning hours of February 1, 2012. As grounds to suppress the statements, the Defendant alleges that his statements were not freely and voluntarily made and were not the product of a valid waiver of Miranda due to his physical injuries and intoxication. The Government argues that the Defendant was not intoxicated at the time of the interview nor did his physical injuries impair his ability to voluntarily, knowingly, and intelligently waive his Miranda rights. The Government asserts the Defendant's statements were made freely and voluntarily. The Government further argues that the Defendant was coherent and responsive and did not have any difficulty in comprehending the questions, his surroundings, or the nature of the circumstances surrounding the questioning.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The Fifth Amendment right to remain silent is intended to operate prophylactically, to protect a defendant from making self-incriminating statements during his arrest or interrogation that might be used against him in the course of subsequent legal proceedings. McGriff v. Dept. of Corrections, 338 F.3d 1231, 1235 (11th Cir. 2003) (citing Miranda v. Arizona, 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

A waiver of Miranda rights must be voluntary, knowing and intelligent; and whether a defendant has waived his Miranda rights is evaluated based on the totality of the circumstances. United States v. Barbour, 70 F.3d 580, 584–85 (11th Cir.1995). There is a two part inquiry into whether or not a defendant's waiver of Miranda rights was voluntary, knowing, and intelligent. U.S. v. Derisma, 2012 WL 537553 *7 (M.D. Fla. February 18, 2012) (citing Barbour, 70 F.3d at 585)); Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 410 (1986). "First the relinquishment of the right must have been voluntary in the sense voluntary that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Derisma, 2012 WL 537553 at *7. "Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. Only if the totality of the circumstances surrounding the interview reveals an un-coerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. Id.

Factors in assessing voluntariness include: the Defendant's age, intelligence, education, and language ability; the Defendant's knowledge of his constitutional right to refuse consent; the degree to which the individual cooperates with the police; and the length of the detention and

nature of the questioning. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973); Ramirez-Chilel, 289 F.3d at 752 (citing United States v. Gonzalez, 71 F.3d 819, 830-31 (11th Cir. 1996)).

At issue in this case is whether intoxication and physical injuries prevented the Defendant from having the capacity to waive his Miranda rights and voluntarily provide a statement to Deputy Chandler.

*1. Whether the Defendant's Statement was Involuntarily Made Due to Intoxication*

The Defendant argues that his "obvious intoxication" raises a serious question as to his ability to make a free and voluntary statement and to knowingly waive Miranda. The Defendant maintains that the evidence and testimony show he was intoxicated to a degree that the statements he made post-Miranda should be suppressed. The testimony in this case supports the Defendant's position that he was drinking alcohol, however, the Court must evaluate whether "his faculties were [] so impaired that he did not understand what was going on nor was he []coherent" when he made the statements. United States v. Martin, 434 F.2d 275, 279 (5th Cir. 1970).

"A confession that was not the product of free will and rationale [sic] intellect or that was made when the individual's will was 'overborne' by physical, psychological, or drug-induced means, is inadmissible." Parker v. Allen, 565 F.3d 1258,1280 (11th Cir.2009) (quoting Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963), overruled on other grounds by Keeney v. Tamayo—Reyes, 504 U.S. 1, 5, 112 S.Ct. 1715, 1717, 118 L.Ed.2d 318 (1992)). In Florida, "the mere fact that a suspect was under the influence of alcohol when questioned does not render his statements inadmissible as involuntary. 'The rule of law seems to be well settled that the drunken condition of an accused when making a confession, unless such drunkenness

goes to the extent of mania, does not affect the admissibility in evidence of such confession, but may affect its weight and credibility with the jury.'" Thomas v. State, 456 So.2d 454, 458 (Fla.1984) (quoting Lindsey v. State, 66 Fla. 341, 63 So. 832, 833 (1913)).

In this case, the Defendant alleges that he was incapable of validly waiving his rights and knowingly making voluntary incriminating statements because he was intoxicated at the time of the interview. While the Defendant suggests that he could have been given pain medication at the hospital which contributed to his intoxication, there is no evidence in the record that the Defendant was given any pain medication at the hospital and no sobriety tests were performed on the Defendant to ascertain his level of intoxication.

The Defendant's witness Megan Cox testified that she had been drinking alcoholic beverages with the Defendant for approximately three and a half hours prior to his arrest and his last alcoholic drink was around 2:00 a.m. (Tr. 143:20-24). Cox believed the Defendant was intoxicated at the time he left the bar and should not have been driving. (Tr. 144:12-19). Cox also attributed the Defendant's altercation with the bouncer to his intoxicated state. (Tr. 145:18-23). The Defendant submits that his actions during the arrest, his non-compliance and confusion, demonstrate how impaired he was at the time.

The Government asserts that the Defendant did not act in a manner consistent with intoxication. The Government proffers that the Defendant was asked on two occasions during the interview whether he was intoxicated and the Defendant stated he was not. (Gov't. Ex. 1(a), p. 1). Both Deputy Cox and Deputy Franko, who were involved in the pursuit and arrest of the Defendant, testified that the Defendant's demeanor during the arrest and hospital visit was normal and neither believed the Defendant was intoxicated at the time. (Tr. 26:1-523:4-25, 24:1-3, 31:1-12, 72:1-8).

Deputy Chandler began questioning the Defendant around 4:05 a.m. approximately two hours after the Defendant had last consumed alcohol. (Gov't. Ex. 1(a), p. 1). Deputy Chandler testified that the Defendant did not appear intoxicated at the time of the questioning. (Tr. 111:16-23). Before Deputy Chandler began the interview he asked the Defendant if he was "under the influence of drugs and or alcohol right now?" (Gov't. Ex. 1(a), p. 1). The Defendant responded "[n]o sir." (Gov't. Ex. 1(a), p. 1).

Deputy Chandler advised the Defendant of his rights, and he intelligently waived those rights, and he then gave a voluntarily statement. (Gov't. Ex. 1(a), p. 1). After Deputy Chandler advised the Defendant of his rights he asked him as follows:

| | |
|---|---|
| Dep. Chandler: | "With these rights in mind are you willing to talk to me now? |
| Defendant: | "Yes sir." |
| Dep. Chandler: | "Okay Daniel, you say you're not under the influence of alcohol? Were you at an earlier point tonight?" |
| Defendant: | "Yes sir." |
| Dep. Chandler: | "Yes? Did they give you something at the hospital that kind of sobers you up a little bit?" |
| Defendant: | "No sir." |
| Dep. Chandler: | "No they didn't give you anything?" |
| Defendant: | "No sir." |
| Dep. Chandler: | "So would it be fair to say you might be under the influence right now or are you feeling pretty sober right now?" |
| Defendant: | "Sober sir." |

(Gov't. Ex. 1(a), p. 2-3). It is clear from Defendant's discussion with the Deputy Chandler that he was not intoxicated when he waived his <u>Miranda</u> rights at the Charlotte County Sheriff's Office. Further, the audio of the interview between Deputy Chandler and the Defendant shows that the Defendant was coherent, clear minded, understood the questions asked by Deputy Chandler and was able to respond without stumbling, mumbling, stuttering or slurring his words during the interview. (Gov't. Ex. 1).

The testimony in this case demonstrates that the Defendant was aware of his surroundings and able to comprehend the consequences of speaking to Deputy Chandler. The Defendant was asked twice if he was intoxicated and answered negatively on both occasions. Furthermore, the evidence suggests that nothing in the Defendant's demeanor led Deputy Chandler to believe he was intoxicated at the time of the interview. "Intoxication, short of ... impairment of the will and mind as to make the individual unconscious of the meaning of his words, will not render a statement or confession inadmissible." <u>Parker v. Allen</u>, 565 F.3d 1258, 1280 (11th Cir. 2009) (quoting <u>Free v. State</u>, 495 So.2d 1147, 1156 (Ala.Crim.App.1986)). Based upon the Defendant's coherent behavior, ability to answer questions, and overall demeanor during the interview, it is clear that his consumption of alcohol earlier in the evening is not enough to support the suppression of the Defendant's post-<u>Miranda</u> statements. <u>Parker</u>, 565 F.3d at 1280 (holding statements should not be suppressed based upon the consumption of alcohol unless the Defendant's intoxication is so severe that he was unaware of his surroundings). After evaluating the testimony and evidence presented at the hearing, the Court finds that the Defendant was not so intoxicated during his interview with Deputy Chandler that he could not voluntarily, knowingly and willingly waived his <u>Miranda</u> rights. Therefore, the Court respectfully recommends that his statements to Deputy Chandler should not be suppressed.

### 2. *Whether the Defendant's Statement was Involuntary Due to Physical Injuries*

The Defendant was transported to the hospital pursuant to Charlotte County Sheriff's Office policy, for injuries sustained after being apprehended by Deputy Franko's K-9 partner. (Tr. 16:1-3, 18:5-22). The Defendant alleges that the physical injuries he sustained during his arrest prevented him from waiving Miranda or making a free and voluntarily statement to Deputy Chandler.

The Government asserts that the Defendant was not physically impaired at the time of the interview and did not act in a manner consistent with physical impairment. The Government argues the Defendant's superficial wounds had no impact on his capacity to speak with Deputy Chandler. Deputy Cox testified that when transporting the Defendant from the hospital to the jail the Defendant did not need assistance walking or give any indications he was in pain. (Tr. 74:7-25, 75:1-16). Although the Defendant alludes that he may have been given pain medication at the hospital, as stated above, there is nothing in the record to support his allegations. Deputy Chandler stated that the Defendant was lucid during the interview and did not appear to be in pain. (Tr. 114:2-17). According to Deputy Chandler, the Defendant was maintaining eye contact and was able to follow along when asked questions during the interview. (Tr. 114:2-17).

A statement can be rendered involuntary due to "unbearable pain." Mincey v. Arizona, 437 U.S. 385, 398-401 (1978). While the Defendant's injuries are relevant in the totality of the circumstances analysis, there is nothing in this case to suggest the Defendant was overcome with pain during his interview with Deputy Chandler. At no point did the Defendant indicate he was experiencing pain. Rather, the Defendant implied his injuries were not severe when at the hospital he said he has had worse injuries and just wanted to go to jail. (Tr. 71:11-25).

In addition, the Defendant was not admitted to the hospital but was treated for superficial injuries in the emergency room and released. The Defendant did not ask for medical treatment or indicate in any way that he was overcome by an excessive amount of pain. Further, the Court has reviewed the exhibits and photographs of the Defendant's injuries and finds that they do not lead to a different conclusion as the wounds sustained by the Defendant during his apprehension appear to be superficial. (Gov't. Ex. 2a-2k).  Therefore, the Court respectfully recommends that the Defendant's physical injuries did not render his statements or <u>Miranda</u> waiver involuntary.

## CONCLUSION

The Court finds that the Defendant's level of intoxication and the severity of his physical injuries, considered cumulatively, does not require the suppression of the statements made by the Defendant. This Court concludes, under a totality of circumstances, that the Government has sufficiently established that the statements made by the Defendant were voluntarily and he knowingly waived <u>Miranda</u>. Therefore, it is respectfully recommended that the Defendant's post <u>Miranda</u> statements made to Dep. Chandler during the interview should not be suppressed.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

Defendant Daniel Charles Kirk's Motion to Suppress Statements (Doc. #24) should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen (14) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this 1st day of April, 2013.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All Parties of Record

16